Your Honor, my name is. Why don't you let the other side just get set up? We're all getting a little impatient here. May I proceed, Your Honor? Yes. Good morning, Your Honors. My name is Ravi Sudhan, and I represent Plaintiff and Appellant Polo Towers Master Owners Association, Inc., in this case. Your Honor, this appeal arises out of a judgment on a motion for summary judgment and a motion for partial summary judgment. There are main, there are four main issues here. Whether the policy, that's all risk policy issued by Factory Mutual, excludes the claim made by Polo Towers based on the contamination exclusion and based on the faulty construction of faulty workmanship exclusion. Third issue is whether the claim is barred by the statute of limitations. And the fourth issue is whether Polo Towers did have a right to conduct some discovery in order to ascertain the intent and the drafting history of those exclusions which Factory Mutual asserted are applicable to this case. Counsel, I'd like to ask you to address the timeliness question, because if the complaint was not brought in a timely manner, we would not reach the other issues. In your view, when was the inception of the loss? That's the phrase used in the policy. Not when you heard about it or knew it was bad, but what was the date of the inception of the loss? August 11, 2001, Your Honor. How is that possible? The loss is the Legionella bacteria contaminating the water. The loss isn't a letter. The loss is the actual physical thing that happened. That is correct. Absolutely correct, Your Honor. So that had to have happened at least by August the 6th, because that's the date when the health department came out to see how bad it was and take the samples. They just collected the samples. Right. We didn't know the results of those samples. But the policy talks about the inception of the loss, not your knowledge of it. Your Honor, absolutely correct. The policy talks about the inception of the loss, but if the person does not even know about the loss, cannot even appreciate when the damage or the loss occurred, there is no inception of loss, Your Honor. Well, but when the letter, when the material was faxed on August the 10th, the letter that comes with it says, you know, we came out and took the samples, and somebody had to tell them there was a problem for them to come out and take the samples. They don't just wander around taking water samples. So why isn't August the 6th the very latest when the inception of loss could have occurred? Because, Your Honor, even if the presence of Legionella in water does not mean any kind of loss, because Legionella may be present in water, it is the concentration or the amplification of Legionella which really matters. Right. And that amplification was set for purposes of this case when the water sample was taken on the 6th of August. That's all we, that's the, that's the sample that had the bad problem that caused this in the first place. Right? There's not another sampling in the record. But we, nobody knew about the results of those samples, Your Honor. So basically, if nobody knows the concentration of Legionella, if that is creating any problem, then there is no inception of loss, because we, we are not even aware of. Otherwise, Your Honor, we have to go a long time back as to when did it actually occur, as to when the, when Legionella was really transmitted into the Tower 2 system. So it's very difficult. The inception of loss for the purpose of this policy is when the insured suffers an appreciable damage or loss. If it is not known to the insured, the insured cannot make any claim. What is the appreciable damage? What is the nature of the appreciable damage? When a reasonable person can ascertain that there is damage or loss to the property. That's, that's the actual date. Because until that time, when the samples were collected, until that time, nobody knew as to the concentration of Legionella. Nobody knew that we had to even shut down the entire Tower 2. There was no loss at all. The first time when we came to know was August 11, 2001. What happened to the August 10 facts? Your Honor, this is, this is the confusion created by Factory Mutual. Because what they did, basically, if you look at, I will, I'll just point it out to the excerpts of record. What they did. The fact says, see attached per our discussion. So there's clearly been a discussion of something, presumably the contents of the letter. But there were only four pages, total four pages. The facts transmitter sheet shows four pages. And what was facts were the regulations, not the letter dated August 10. If you look at the, if you look at the top of those regulations, Your Honor will see the facts imprint, the transmission imprints. But on, on the letter, August 10, there is nothing because it was, it was made. It was not even sent by facts. And this is the, this is the confusion created by Factory Mutual when they attached both these documents, which were separate documents, under one exhibit. Well, what was the discussion? Srinivasanamurti Your Honor, I do not know what the discussion was, to be very frank. So I cannot answer that question. The only thing is that they did send the regulations about the powers of the county health department as to what they can do. It's at ER, except for the record, page 127, Your Honor. It starts actually at page 125, which is Exhibit B, to Attorney Wong's declaration. 2001 letter. So the first time Polo Towers came to know about this was when the county employees showed up at Polo Towers on August 11, 2001. That was the first time the notice was given. And there's no evidence on the record which shows anything otherwise what the record here is and what the declarations show, the evidence show. It's our evidence. We made it very clear in our declarations. There's a testimony. There's a deposition testimony. So basically what happened here, and I know that the district court was even confused about it, and the district court thought, and it's in the reporter's transcript, that somehow this August 10, 2001 letter was also faxed. But that was not true. I understand your point. Thank you, Your Honor. So the inception of losses, inception date is August 11, 2001, and not August 6, 2001, Your Honor. Now, if I give you a little background about the facts of this case, in fact, you know how Polo Towers is constructed, it's basically an H shape. One leg, which is the vertical leg, is Tower 1, and then there's a horizontal leg, which is Tower 2, and then again there's a vertical leg, which is Tower 3, which was constructed separately, which was not even owned by Polo Towers at that time during the construction. What happened? That the construction crew, which was not hired by Polo Towers, the Polo Towers did not have any control or management over the construction crew, they entered the Tower 2 equipment room, they cut through and connected the water system of Tower 3 to Tower 2 system without installing any kind of backflow preventers, without hyperfluorinating the Tower 3 system, and without superheating the Tower 3 system. And this was the only cause which caused legionella outbreak in Tower 2 system. So the question here is because every time we hear from Factory Mutual that there was no physical damage, the first confusion created by them is whether they are talking about no physical damage or loss claimed by Polo Towers, or they are talking about no physical damage as a result of which the legionella outbreak occurred. We were given this kind of impression that they are talking about there was no physical loss or damage claimed by Polo Towers. And that's what we showed to them, that the entire building was closed, we had to spend so much of money, we had to replace everything, and this is, this constitutes physical loss and damage. Then they changed their position and they started saying, no, no, no, no, no, there was no physical damage as a result of this, as a result of which contamination took place. Your Honor, if you look at the language used in the policy, this contamination exclusion does not even apply. That's what I don't understand. Why doesn't it? Your Honor, two reasons. Number one is that contamination as such, this war, and has been explained by numerous courts all over the United States, it's a, it's a, it's a, it's a, it's a term of art. And this can be boundless in the sense that the terms contaminants, irritants, they can be, they can be any substance or chemical which can cause damage or irritation to some of the human beings anytime. So there has to be some kind of limit to this. This contamination exclusion, basically I believe that it intends to exclude an environmental, traditional environmental contamination which occurs over a period of time by products or a policy. Like if I may bring Your Honor's attention to the contamination exclusion, which is exclusion 5D of the policy. It's at page 201 of the excerpts, Your Honor. It says this policy excludes the following unless directly resulting from other physical damage not excluded by this policy. Then it lists three items. Item number one is contamination, including but not limited to the presence of pollution or hazardous material. Item number two, shrinkage. Item number three, change in color, flavor, texture, or finish. All these, if you look at how this policy is framed, all these items basically, they occur over a period of time. And the most important thing here is that it says physical damage, other physical damage. So the burden is on the insurer, and it is a well-established law. And even the Nevada Supreme Court back in 1959 recognized this law in National Auto and Casualty Insurance Company v. Havas, which is cited as 75 Nevada 301, that if the insurer has to bring its case under one of the exclusions, the burden is on the insurer. That burden does not shift whether it's under the rule, under the Federal Rules of Civil Procedure 56. They have to show that there was no physical damage at all before bringing this exclusion in application. There is absolutely not even a shred of evidence produced by them which shows that there was no physical damage. Well, now, wait. You're arguing there was physical damage. Yes, Your Honor. But I thought you were also arguing that the contaminant exclusion does not apply. That is correct, Your Honor. This contamination does not apply because it relates, and I thought you said it relates to physical damage over time, which is not, and you say that's not what this is? That is absolutely correct. Your Honor, there are different requirements. The first requirement is that there is a physical, there has to be physical damage. Yes. What we are saying that even if you say that this contamination exclusion applies, it is because of the, it results from physical damage. So it does not apply. Unless the physical damage is itself excluded, which, of course, is their argument that the physical damage is from faulty workmanship, which also is excluded. I will come to the faulty workmanship exclusion also, Your Honor. Can I deal with the contamination exclusion first? Okay. Now, if you can. Well, they're related because the physical, other physical damage has to be, quote, not excluded by this policy, end quote. So you have to demonstrate not just physical damage, but a physical damage that's not excluded. When they're talking about this faulty construction, they're talking about the faulty construction within that building, within that owner's control. They're not talking about faulty construction in any other building, which is not even controlled by any other person. Now, tomorrow there is something, some excavation is going on in my neighbor's land, and as a result of that, means they move. Well, if that's true, what do you make of the phrase in the policy, at page 22 of the policy, where it says, faulty workmanship, material construction or design from any cause? What do you do with from any cause? Doesn't that seem broader than just within the control of the owner? Your Honor, when they say any cause, does not mean that the cause, which is happening under some other person's control. They are saying any cause means if somebody has done something, means it may be related to your, your activity, some other person's activity, but it does not mean some other's, other person's property. And why faulty construction is excluded? Because most of the time, all policies, it's an all-risk policy, which covers basically all possibilities of risk. But any other policy, like, let's, let me give you an example, like comprehensive general liability policy, other policies, they do not cover faulty construction. And the reason is that these are insurance policies. These are not warranty. This is not a warranty for anybody's faulty workmanship. And even in their faulty workmanship, there is an exclusion. It's not an exclusion. Actually, there's a proviso which says that if there is any resultant damage or loss, then that resultant damage or loss is covered. And let me give you an example. Let's say that the roof is tilted, but there is no resultant damage or loss. There's no coverage. But if the roof is tilted and the water is leaking, which is causing some kind of loss or damage to the carpet or to the property, it is covered. So faulty workmanship here is absolutely not covered. It's not – it has got no meaning because this was – there was no construction going on in Tower 2 at that time. And Tower 3 was not even controlled or owned by us, by Polo Towers. Are you suggesting to us that the folks from Tower 3 came in and left no marks whatsoever on Tower 2 to show that they had tapped into the water? I'm sorry, Your Honor. I – they did come. Yeah. They cut through the drywall. They cut the piping. And they tied it into the Tower 3 system. And you guys weren't around and nobody saw anything, and it was all done in the dark of the night. It was, Your Honor, is in the declaration. It was not with the consent of Polo Towers. Did anybody see that, Your Honor? To be very frank, I cannot answer that question at this time. Your time has expired. Okay. Thank you, Your Honor. Good morning. Joyce Wong for Factory Mutual. And I will try to be brief. I think I will address the discussion about the statute of limitations since that was discussed first. And I would like to address the comments about this fax, this August 10 fax. If you look at what is attached, even according to Mr. Sudan's argument to that it appears to be sections from these Nevada statutes that empowers the health authority to go into a suspect property and investigate claims of health risk and take tests and so on and so forth. And by faxing that to Polo Towers' Troy Magdos, I think it evidences that the discussion referenced on the cover sheet had to do with the health authority's authority to go on to the Polo Towers' property and conduct the testing that had already been conducted, as Your Honor pointed out, on August 6th. We argued that August 10th was the date that Polo Towers unquestionably had notice and appreciation, if you will, that they had a serious Legionella problem on their property. But I think that arguably if we had done more discovery, we could have argued at a much earlier date because the reason this even came up is that people became ill in the spring of 2001, in I think March and April of 2001. So there's some question whether they might have had notice much earlier, but we felt that to give the benefit of the doubt given the amount of discovery that we had, August 10th was probably the safer date. And even if you give them the extra day, which pushes it to August 11th, when counsel concedes they definitely had notice and that was the day that the health authorities were passing out flyers on their property and so on, I don't believe that helps them because the statute of limitations in the policy says that the action has to be within a year, not by a year. And there are cases that actually say that gives you 364 days, remarkably, but that is the law. And in order to be within a year, they still would have had to file by August, at the latest, I believe, August 2nd. Yes, I'm sorry. To do the counting, I think actually you were overly generous. I think I have to go back and do the counting, but it's, I think it may be even earlier than that. I'm not sure how we arrive at those number of days, but we can go back and look at that. Okay, then I won't belabor the point. If you think we were generous, I'll leave it at that. And I don't want to belabor the contamination point either because, of course, it's briefed to death in all of our papers, and the argument from the motion in the district court is actually attached in the excerpts of record. Basically, this is a very common-sense case and issue, and it's about whether Legionella bacteria in water is contamination under an insurance policy, under the plain meaning of the word contamination, and common sense, I think, would tell everyone in this room that it is, and that was evidenced by plaintiff's admissions and their request for admission, by plaintiff's own representatives in their sworn testimony and deposition, by plaintiff's own experts, by plaintiff's own counsel, and this is all reviewed, of course, in our brief that has been filed with this Court, the many admissions and descriptions of the situation as contamination. Not that that's dispositive, but it does demonstrate that everybody has an understanding of the plain meaning of the word contamination as it applies to this case, and Legionella in water is very simply contamination. One of the arguments that plaintiff made was that the contamination exclusion does not list bacteria. That is not necessary, of course, because contamination includes lots of things, and there are cases that say it does include bacteria. Specifically, the Landshire case, which is directly on point, found that Listeria bacteria in sandwiches was clearly a contaminant and denied coverage under a property policy. Facts quite similar, although it, of course, involved a food. But the otherwise, the facts and the analysis are applicable to our situation. And very quickly, then, on the faulty workmanship point, it's undisputed at this point as to what happened, and Polo Towers has conceded that what probably caused the Legionella to get into the water at these levels was the failure by a contractor to hyperchlorinate and superheat and clean the pipes before they were connected, and that is faulty workmanship. The policy is very broad, excludes faulty workmanship from any cause, whether that's physical damage or not, and whether the contamination is physical damage or not doesn't really matter, because if they are physical damage, they're very clearly excluded by the terms of our policy. If you don't have any other questions, I'll sit down. Thank you. Thank you. I think you used your time, but or did you? If you feel compelled to say something, we can do it. About the statute of limitations, let me give you some days which I counted, because if it starts from August 11, 2001, Your Honor, it runs up to September 16, 2001, because the claim was filed on September 17, 2001. So we have used 27 days over there. Thereafter, when we received the denial letter ---- September 5, 2002. Your Honor, that was the date printed on that letter. That is not the date when we received that letter. There is absolutely no evidence as to when that letter was really sent and how it was sent. There is no evidence. But we received it in the mail. That was on September 9, 2001. And it's not that our office received it on September 9, 2001. It's the factory mutual's supervisor, Mr. Munson. He received the same letter from Mr. Shor exactly on September 9, 2001. So there is no dispute. The cause of action accrues only when the person knows about the cause. The cause of action cannot accrue because a date is printed on a letter. So the cause of action starts accruing or running again starting from September 9, 2001. The first day is always excluded. The last day is included. But even if I take September 9, 2001 and up to August 1, 2002, it's 327 days, Your Honor. And 37 days and 327 days is 364 days. August 2nd was a Saturday. August 3rd was a Sunday. We filed this lawsuit on August 4th. We were well within the statute of limitations, Your Honor. Thank you, Your Honor. The case just argued is submitted for decision. That concludes the Court's calendar, and the Court stands adjourned.
judges: Schroeder, Graber, Duffy